UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

----oo0oo----

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>KEITH MORENO,<br><br>    Defendant. | No. 3:20-cr-29 WBS DLB<br><br>MEMORANDUM AND ORDER RE: MOTIONS TO DISQUALIFY AND TRANSFER VENUE |

----oo0oo----

Defendant has moved to disqualify the United States Attorney's Office for the District of Nevada and to transfer venue. (Docket Nos. 35, 36.) The court held a hearing on the motions on November 9, 2020.

I. Motion to Transfer Venue

Defendant primarily contends that negative publicity regarding a protest in Reno on May 30, 2020 and publicity regarding his alleged commission of the crime charged, including a video of the alleged offense aired during a news broadcast, requires a change of venue.

1

A criminal defendant is entitled to a change of venue where prejudicial pretrial publicity makes it impossible to seat an impartial venue. Daniels v. Woodford, 428 F.3d 1181, 1210 (9th Cir. 2005). To prevail on a motion to transfer venue, a defendant must demonstrate actual prejudice or presumed prejudice.[1] Id. Prejudice may be presumed "only in extreme instances when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." Id. (citation and internal punctuation omitted). To determine whether the defendant has established a presumption of prejudice, the court must assess

> (1) whether there was a barrage of inflammatory publicity immediately prior to trial, amounting to a huge wave of public passion, (2) whether the news accounts were primarily factual because such accounts tend to be less inflammatory than editorials or cartoons; and (3) whether the media accounts contained inflammatory or prejudicial material not admissible at trial.

Id. (citation and internal punctuation omitted).

Here, while there has been some pretrial publicity regarding the defendant and the allegations against him, there has been nothing close to a "barrage of inflammatory publicity" regarding him specifically. The news accounts about him and this case appear to have been factual and not inflammatory, primarily

---

[1] To demonstrate actual prejudice, a defendant must show that "the jurors demonstrated actual prejudice or hostility that could not be laid aside." Daniels, 428 F.3d 1181. Notwithstanding defendant's contention that transfer is warranted based on both presumed and actual prejudice (see Mot. at 10 (Docket No. 36)), any motion based on actual prejudice is premature before jury selection.

reporting what the United States Attorney's Office has alleged in press releases and court documents.  Further, press about the case appears to have diminished over time, and trial will not commence for at least another three months (if not longer due to the COVID-19 pandemic).  See Randolph v. California, 380 F.3d 1133, 1142 (9th Cir. 2004) (passage of time "helps mitigate any bias the media coverage might have created").[2]

The court also rejects defendant's contention that general negative publicity about the Reno protest will prevent him from receiving a fair trial.  Defendant has only been accused of damaging one or more windows at the Reno courthouse, and there are no allegations that he is responsible for any other damage in the city from the protest.[3]  Defendant suggests that the citizens of Reno or northern Nevada will feel that they have been personally injured by the crime charged against defendant.  However, it was federal property which was damaged, and the

---

[2] The court recognizes that at least one television station aired a short broadcast allegedly showing the commission of the crime and that the United States Attorney's Office issued a press release claiming the defendant confessed to the crime.  However, this publicity pales in comparison to the "barrage of newspaper headlines, articles, cartoons and pictures . . . unleashed against [the defendant] during the six or seven months preceding his trial" and the extensive newscasts on television and radio in Irvin v. Dowd, 366 U.S. 717, 725-26 (1961), which included, among other things, the defendant's confession to six murders.  See also Rideau v. State of Louisiana, 373 U.S. 723, 723-26 (1963) (reversing conviction where sheriff staged and broadcast multiple times a twenty minute "interview" where the defendant confessed to robbery, kidnapping, and murder, and three members of the jury had seen the interview).

[3] The government appears to allege that defendant was responsible for only some of the damage at the federal courthouse, as other individuals were involved.  (See Compl. (Docket No. 1).)

1 people of Reno and northern Nevada will be no more required to
2 pay for the loss than will be the people of the rest of the
3 United States.  Defendant also speculates that jurors will hold
4 him responsible for damage caused by other individuals throughout
5 the city on May 30, 2020, but such a contention is not supported
6 by the evidence before the court.

7 　　　　　Overall, defendant has not shown that the community
8 where defendant will be tried is so saturated with prejudicial
9 and inflammatory media publicity about the crime that he cannot
10 receive a fair trial.⁴  See Daniels, 428 F.3d at 1211.
11 Accordingly, the court will deny the motion to transfer venue.
12 II.  Motion to Disqualify

13 　　　　　Defendant moves to disqualify the United States
14 Attorney's Office for the District of Nevada because it has
15 office space and conducts business in the Bruce R. Thompson
16 Federal Courthouse in Reno, the building allegedly damaged by the
17 defendant.

18 　　　　　"The disqualification of [g]overnment counsel is a
19 drastic measure and a court should hesitate to impose it except
20 where necessary."  United States v. Bolden, 353 F.3d 870, 878-79
21 (10th Cir. 2003).  "[B]ecause disqualifying government attorneys
22 implicates separation of powers issues, the generally accepted
23 remedy is to disqualify a specific Assistant United States
24 Attorney, not all the attorneys in the office."  Id. (citation
25 and internal punctuation omitted); see also United States v.

---

⁴   On voir dire, defendant will be able to propose questions to potential jurors about their knowledge of this case, and the court will consider any challenges for cause based on prior knowledge of this case at that time.

1 Hasarafally, 529 F.3d 125, 128 (2d Cir. 2008) ("While a private
2 attorney's conflict of interest may require disqualification of
3 that attorney's law firm in certain cases . . . such an approach
4 is not favored when it comes to the Office of a United States
5 Attorney . . . .").

6    Notably, the court is unaware of any case, and
7 defendant has cited none, where the disqualification of an entire
8 United States Attorney's Office has been upheld on appeal.  See
9 Bolden, 353 F.3d at 879 (stating that "every circuit court that
10 has considered the disqualification of an entire United States
11 Attorney's office has reversed the disqualification").

12    Defendant's motion argues that prosecutors must be
13 "disinterested" and that the United States Attorney's Office for
14 the District of Nevada has shown it is not disinterested by (1)
15 its decision to bring federal charges rather than leave
16 prosecution to state officials; (2) its decision to charge the
17 defendant with a felony, rather than a misdemeanor; and (3) its
18 issuance of a press release about the case, which purportedly
19 indicates the "significant pressure from the public to pursue the
20 case."  (Mot. at 10 (Docket No. 35).)

21    As an initial matter, it is true that the Supreme Court
22 discussed the need for a "disinterested prosecutor" in Young v.
23 United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 807-10
24 (1987).  However, "disinterested" in this context does not mean
25 that the prosecutor should not be interested in the outcome of
26 the case.  Of course, in an adversary system every attorney is
27 expected to be "interested" in the sense that he or she wants to
28 win his or her case.  Instead, disqualifying conflicts of

1  interest appear to concern some type of personal or pecuniary
2  interest the attorney has in the outcome of the case.  See, e.g.,
3  United States v. Kahre, 737 F.3d 554, 573-74 (9th Cir. 2013)
4  (noting that Young presented a narrow ruling regarding the
5  conflicts of interest presented by private attorneys representing
6  their private clients while also prosecuting contemnors).  No
7  such conflict is present here.
8        The Ninth Circuit's decision in United States v.
9  Lorenzo, 995 F.2d 1448 (9th Cir. 1993), is instructive on this
10 issue.  There, defendants were convicted of a scheme which
11 involved, among other things, using federal income tax forms as a
12 means of retaliating against others and also to receive tax
13 refunds.  One defendant used this scheme against the United
14 States Attorney for the District of Hawaii and an Assistant
15 United States Attorney who had handled a civil foreclosure action
16 against him.  The defendants argued that because the United
17 States Attorney and several assistants were "victims" and
18 testified as witnesses at trial, the district court should have
19 disqualified the entire United States Attorney's Office.  Id. at
20 1448-52.
21       The Ninth Circuit affirmed, noting, among other things,
22 that (1) none of the members of the United States Attorney's
23 Office who testified participated in the prosecution; (2) the
24 United States Attorney's Manual did not require disqualification,
25 as the Manual "is not intended to, does not, and may not be
26 relied upon to create any rights, substantive or procedure,
27 enforceable by any party in any matter civil or criminal"; (3)
28 the defendants had not shown actual prejudice in part because

there was no suggestion that the charges were brought because of the victimization of the United States Attorney himself or that the office did not exercise its discretionary function in an "even-handed manner." Id. at 1452-53.

If disqualification of the United States Attorney's Office was not required in Lorenzo, where the United States Attorney and certain Assistant United States Attorneys were victims and/or witnesses, disqualification cannot be required here. See also United States v. Hubbard, 493 F. Supp 206, 207-08 (D.D.C. 1979) (denying disqualification of entire United States Attorney's office where defendants were charged with burglary and theft from the office of an assistant United States attorney).

The only purported conflict in this case is that certain employees of the United States Attorney's Office work or appear at the courthouse at issue. However, it cannot be said that those individuals were directly harmed, as was the case in Lorenzo.[5] At oral argument, defense counsel conceded that the

---

[5] The court acknowledges that the judges of the District of Nevada and the Pretrial Services Office for the District of Nevada have recused themselves from this case. However, without expressing an opinion as to whether those recusals were required, the court simply notes that potential recusal or disqualification of an entire United States Attorney's office is not governed by the standards for recusal or disqualification of judges or a pretrial services office, which is an arm of the court. Judges are required to be impartial. While the United States Attorney and Assistant United States Attorneys have a responsibility to ensure that justice is served, as advocates for the United States, they are not required to be impartial, and indeed should not be, in the same regard as a judge. Accord Young, 481 U.S. at 810 ("[W]e have indicated that the standards of neutrality for prosecutors are not necessarily as stringent as those applicable to judicial or quasi-judicial officers . . . . We may require a stronger showing for a prosecutor than a judge in order to conclude that a conflict of interest exists.") (citation

7

United States Attorney's Office's office space was not physically affected by defendant's alleged acts, that the Office was merely a tenant of the building, and that the Office would not be required to pay for cleanup or repair, either directly or in the form of higher rent.[6]

In the court's view, prosecution of this case by the United States Attorney's Office for the District of Nevada is essentially the same as it would be for the prosecution of damage to any federal property within the district. Here, the risk of a conflict of interest, or the appearance of a conflict, based on vandalism of a federal courthouse, even where the United States Attorney has offices, is less than that presented by a case where the United States Attorney and his or her staff were victims or witnesses of the crime charged, as was the case in Lorenzo.

Overall, the court does not find that the United States Attorney's Office's tenancy and appearance in cases in the Reno courthouse create either an actual conflict of interest or the appearance of a conflict.[7] Accordingly, the court will deny

---

omitted).

[6] The criminal complaint alleges that Moreno damaged three windows at the federal courthouse and that it would cost approximately $15,000 to repair that damage, though an affidavit attached to the complaint alleges that several individuals threw objects at the courthouse windows on May 30, 2020, resulting in damage to seven windows, cleaning costs of $8,189.99, and estimated repair costs of $36,426.80. (Docket No. 1.)

[7] The court also rejects defendant's contention that the charging decision and issuance of a press release indicate a conflict of interest. While the government could have charged defendant with a misdemeanor rather than a felony, and perhaps could have used milder language in its press release or could have declined to issue a press release, these issues arise in any

1  defendant's motion to disqualify.

2        IT IS THEREFORE ORDERED that defendant's motions to
3  transfer venue and disqualify the United States Attorney's Office
4  for the District of Nevada (Docket Nos. 35, 36) be, and the same
5  hereby are, DENIED.

6  Dated:  November 12, 2020

*/s/ William B. Shubb*
WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

---

number of cases.  Defendant does not cite any authority, and the court is unaware of any, holding that such conduct tends to show a conflict of interest.  To the contrary, the press release here appears to be substantially similar to press releases regularly issued by United States Attorney's offices around the country in other criminal cases.

9